Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/16/2021 08:08 AM CST

- 378 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF XAIDEN N.
Cite as 30 Neb. App. 378

In re Interest of Xaiden N., a child
under 18 years of age.
State of Nebraska, appellee,
v. John N., appellant.

___ N.W.2d ___

Filed November 9, 2021.    No. A-21-157.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below.

2. **Juvenile Courts: Evidence: Appeal and Error.** When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another.

3. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292 (Reissue 2016) contains 11 separate subsections, any one of which can serve as a basis for terminating parental rights when coupled with evidence that termination is in the best interests of the child.

4. ____: ____. To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in Neb. Rev. Stat. § 43-292 (Reissue 2016) exists and that termination is in the child's best interests.

5. ____: ____. Neb. Rev. Stat. § 43-292(7) (Reissue 2016) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent.

6. **Parental Rights: Presumptions: Proof.** A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit.

7. **Parental Rights: Statutes: Words and Phrases.** Although the term "unfitness" is not expressly stated in Neb. Rev. Stat. § 43-292 (Reissue

2016), it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests.

8. **Parental Rights: Words and Phrases.** Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.

9. **Parental Rights.** In the context of a termination of parental rights case, the best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other.

Appeal from the Separate Juvenile Court of Douglas County: Candice J. Novak, Judge. Reversed and remanded for further proceedings.

Thomas C. Riley, Douglas County Public Defender, and Lauren A. Walag for appellant.

Donald W. Kleine, Douglas County Attorney, and Nathan Barnhill for appellee.

Riedmann, Bishop, and Arterburn, Judges.

Bishop, Judge.

## INTRODUCTION

John N. appeals from the order of the separate juvenile court of Douglas County terminating his parental rights to his son, Xaiden N. We reverse, and remand for further proceedings.

## BACKGROUND

### Procedural Background

John is the father of Xaiden, born in 2019. Unique W. is Xaiden's mother. The State also sought to terminate Unique's parental rights to Xaiden, and the record reflects that she ultimately relinquished her parental rights. Because Unique is not part of this appeal, she will be discussed only as necessary.

On June 7, 2019, 1-month-old Xaiden was in a vehicle with his parents. The vehicle was stopped for a traffic violation, and John and Unique were arrested and taken into custody

- 380 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF XAIDEN N.
Cite as 30 Neb. App. 378

on outstanding warrants for second degree arson. Because there was no one to care for Xaiden, he was placed in the emergency temporary custody of the Nebraska Department of Health and Human Services (DHHS). That same day, Xaiden was placed in foster care, where he has remained.

The State filed a supplemental petition on June 10, 2019, alleging that Xaiden fell within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because he lacked proper parental care by reason of the fault or habits of John. The State specifically alleged that John was currently incarcerated; he was arrested on June 7, and no suitable caregiver could be contacted for Xaiden; he failed to provide proper parental care, support, and/or supervision for Xaiden; he failed to provide safe, stable, and/or appropriate housing for Xaiden; and for the above reasons, Xaiden was at risk for harm.

In September 2019, following a contested adjudication hearing, Xaiden was adjudicated as being within the meaning of § 43-247(3)(a) based on the fault or habits of John. The matter proceeded to immediate disposition. The juvenile court ordered John to undergo an initial diagnostic interview as arranged by DHHS. The court also ordered that John be allowed reasonable rights of agency-supervised visitation, when no longer incarcerated.

After continued disposition, evaluation, and permanency planning hearings in October 2019 and February 2020, John was ordered to obtain and maintain a stable and legal source of income; obtain and maintain safe, appropriate, and adequate housing for himself and his child; and not participate in any behaviors or activities that could or would result in incarceration or lengthening his time in incarceration. The court also ordered that John be allowed reasonable rights of agency-supervised visitation. Additionally, after an August review and permanency planning hearing, John was ordered to submit to random urinalysis testing as directed by DHHS and to participate in, and successfully complete, "Level 2" intensive outpatient treatment for cannabis use.

On September 23, 2020, the State filed a motion to terminate John's parental rights to Xaiden pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State alleged that John substantially and continuously or repeatedly neglected and refused to give Xaiden necessary parental care and protection, reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication of Xaiden under § 43-247(3)(a), Xaiden had been in an out-of-home placement for 15 or more months of the most recent 22 months, and termination was in Xaiden's best interests.

## Termination Hearing

The hearing on the motion to terminate John's parental rights was held on January 21, 2021. The State called two witnesses to testify. John appeared via videoconferencing and testified in his own behalf. Several exhibits were also received into evidence. A summary of the relevant evidence follows.

Cassandra Bailey testified that she had been a case manager since November 2019 and that prior to being a case manager, she had been a family permanency specialist. Her duties for both jobs included working with families involved in the juvenile court system. She would assess them and provide them services to work toward the permanency objective, as well as look out for the best interests of the children.

Bailey was first assigned to Xaiden's case in June 2019, and she remained his case manager at the time of the termination hearing. Xaiden became a state ward on June 7, 2019, when he was approximately 1 month old and was placed in agency-based foster care, where he remained. He was left with no caregiver after both of his parents were arrested on warrants for second degree arson.

A certified copy of court documents from John's criminal case was received into evidence. It reveals that John pled no contest to and was convicted of second degree arson, a Class III felony, regarding a fire that occurred on May 24, 2019. John was sentenced to 4 years' imprisonment followed by

- 382 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF XAIDEN N.
Cite as 30 Neb. App. 378

2 years' post-release supervision, and he was given 328 days' credit for time served. According to Bailey, John was projected, but not guaranteed, to be released in June 2021.

Bailey testified that, initially, John was incarcerated at the Douglas County Correctional Center. After sentencing, he was transferred to the Nebraska State Penitentiary sometime between April and June 2020. Bailey saw John once a month at the Douglas County Correctional Center, and he would ask for pictures of Xaiden. With the onset of the COVID-19 pandemic, in-person visits became difficult, so Bailey communicated with John through monthly letters. In her letters, Bailey included information on case progress and John's court orders, and she provided him updates on Xaiden. John responded twice, once in June and once in July. In June, John thanked her for providing an update on Xaiden and for sending pictures, he asked for more pictures, and he said that he was trying to get Bailey's contact information on his approved call list. In July, John again thanked Bailey for the pictures and asked for more, said he was still trying to get her on the approved call list, and said he would never give up his rights to Xaiden. John did not request visitation with Xaiden in either letter. After the July letter, John failed to remain in contact with Bailey.

Bailey authored court reports in February, July, and December 2020 regarding Xaiden and his family's progress toward reunification; these reports were received into evidence over John's hearsay and confrontation objections. Bailey stated that the court ordered John to not participate in any activity that would result in lengthening his incarceration; to participate in and complete "Level 2" intensive outpatient treatment for cannabis use, as recommended in his initial diagnostic interview completed in February; to obtain and maintain safe and stable housing; to obtain and maintain a legal source of income; and to submit to random urinalysis testing. However, he was not given the opportunity to comply with the orders because of his incarceration. John indicated that he was supposed to receive a settlement from an accident he was in,

- 383 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF XAIDEN N.
Cite as 30 Neb. App. 378

but Bailey had no proof of the settlement. John also said that he would obtain housing, but he did not provide any specifics to Bailey.

Bailey stated that John was supposed to get visits with Xaiden. John was not able to have in-person visits while he was at the Douglas County Correctional Center. However, Bailey learned about a program at the Nebraska State Penitentiary called Destination Dads. The program would have allowed John to have virtual visits with Xaiden. Bailey claimed a "Ms. Crowder," who she believed was John's case manager at the facility, told Bailey that she discussed the program with John. (We note, however, that John testified that Crowder was a case manager for another unit, not his unit.) After learning about the program from Crowder, Bailey wrote a letter about it to John in August 2020, but she did not get a response. That same month, Bailey also emailed Crowder, asking her to notify Bailey when John was willing or able to participate in the program; again, Bailey did not get a response. To Bailey's knowledge, John never participated in the program.

Because John has been incarcerated through the entirety of this case, Bailey had no way to assess his ability to meet his own needs, his parenting skills, or his ability to meet Xaiden's needs. Bailey opined that John's parental rights to Xaiden should be terminated because Xaiden had been in foster care for a majority of his life and had not been able to get to know John and had no bond with him. On cross-examination, Bailey was asked if her belief that John was unfit was based on his incarceration, and she responded in the affirmative.

Xaiden's foster mother testified that he had been in her care since June 7, 2019, when he was 4 weeks old. John never called the foster mother or attempted to communicate with her in any way, and Xaiden did not have any visitation or contact with John. John did not provide any money, gifts, or birthday cards for Xaiden. The foster mother provided pictures of Xaiden to Bailey to pass on to John.

John testified that every time he had been to court, written a letter, or come into contact with anyone who had anything

- 384 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF XAIDEN N.
Cite as 30 Neb. App. 378

to do with Xaiden, he requested pictures of Xaiden, but that he had not received such pictures "since last year, about four or five months." When he met with his caseworker, John discussed reuniting with Xaiden. When asked if he had the ability to communicate with Xaiden's foster parents, John stated, "[A]ll my communication is through [Bailey,] I do not have anyone's address or anyone's phone number, as far as the foster parents are concerned."

John stated that he wants to have visitation with Xaiden and to reunite with him. John was not made aware of the Destination Dads program by Bailey or anyone else. On cross-examination, John confirmed that he had not had contact with Xaiden for the past 1½ years. He said that he asked Bailey about seeing Xaiden but was told he would not be able to see him because of the COVID-19 pandemic restrictions. When asked if he ever asked Bailey to arrange for a virtual visit with Xaiden, John responded, "Yes[,] I asked for several visits." The last time he requested visitation was in "July or August [2020], somewhere in there . . . but as . . . Bailey stated, she hasn't contacted me in months."

John testified that he was incarcerated at the Nebraska State Penitentiary with a discharge date in June 2021. He stated, "I do not see [sic] parole board, no one can deny me that date," "it's a jam date." He denied doing anything to prolong his incarceration.

Upon his release from incarceration, John said he will "immediately" look for housing for himself and Xaiden. John has also been in contact with the "VA office to participate in programs" upon release, because he has not been able to participate in "Level 2" intensive outpatient therapy during his incarceration. Although not ordered by the court to do so, he did sign up for a parenting class at the Nebraska State Penitentiary, but was on a waiting list. John did not have employment arranged for after his release. However, when asked if he had a source of income, he stated, "I received a [lump-sum] monetary settlement from a civil suit." He did

- 385 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF XAIDEN N.
Cite as 30 Neb. App. 378

not provide confirmation of the settlement to Bailey because she never asked and he did not know it was required. The juvenile court asked John about the amount of the settlement he received. John stated that the case was "settled for a little over a hundred thousand dollars," but "they are still reducing some medical bills." He also stated, "I just spoke to my attorney this morning, actually, and I'm supposed to receive, I guess, the paperwork and everything I'm supposed to sign before they send the check."

## Juvenile Court's Order

In an order entered on January 28, 2021, the juvenile court terminated John's parental rights to Xaiden after finding by clear and convincing evidence that statutory grounds for termination existed pursuant to § 43-292(2), (6), and (7) and that termination of parental rights was in Xaiden's best interests.

John appeals the juvenile court's order.

## ASSIGNMENTS OF ERROR

John assigns, summarized and restated, that the juvenile court erred in finding that (1) statutory grounds existed to terminate his parental rights and (2) termination of his parental rights was in Xaiden's best interests.

## STANDARD OF REVIEW

[1,2] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

[3,4] In Nebraska, the grounds for terminating parental rights are codified in § 43-292. That statute contains 11 separate subsections, any one of which can serve as a basis for

- 386 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF XAIDEN N.
Cite as 30 Neb. App. 378

termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Mateo L. et al., supra*. It is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al., supra*.

## STATUTORY GROUNDS FOR TERMINATION

We turn to the statutory bases alleged here. In its motion, the State sought to terminate John's parental rights under § 43-292(2), (6), and (7). The juvenile court found all three grounds existed by clear and convincing evidence.

John asserts that the State failed to meet its burden to prove § 43-292(2), (6), and (7) because it relied solely upon his incarceration as justification for termination.

[5] Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 formula is met, § 43-292(7) is met. *In re Interest of Mateo L. et al., supra*.

In this case, Xaiden was placed in agency-based foster care on June 7, 2019, and he remained with foster parents through at least January 2021, when the trial ended. That period easily satisfies the 15-out-of-22 formula.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for termination of parental rights in this case. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning the other statutory bases for termination. See *In re Interest of*

- 387 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF XAIDEN N.
Cite as 30 Neb. App. 378

*Mateo L. et al., supra*. We next consider whether termination is in Xaiden's best interests.

## BEST INTERESTS AND UNFITNESS

[6-9] Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.*

Xaiden has spent all but the first month of his life in foster care because of John's incarceration for an arson committed after Xaiden was born. By his own actions, John put himself in a position where he was unable to provide or care for Xaiden. While incarcerated, John had no visitation or other contact with Xaiden. Bailey testified that John was not able to have in-person visits, but that the Destination Dads program would have allowed for virtual visits. John testified that no one made him aware of the program. Bailey testified otherwise. And

- 388 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF XAIDEN N.
Cite as 30 Neb. App. 378

although Bailey stated that Crowder discussed the program with John, we only have her hearsay testimony to establish that Crowder actually did so. Further, Bailey never received a response to her August 2020 email asking Crowder to notify Bailey when John was willing or able to participate in the program. Bailey testified that she herself wrote a letter about the program to John in August 2020, but she did not get a response. That letter was not offered or received into evidence, and John claims he did not receive such a letter.

Besides the Destination Dads program, there is limited evidence in our record as to what other opportunities John had for programming while incarcerated. The record reflects that he participated in a violence reduction program and that he was on the waiting list for a parenting class. However, there is no other evidence that Bailey worked in conjunction with the correctional facilities to see what programming was available to John, and no one from the correctional facilities was called to testify about available programming.

Bailey testified that as a result of the COVID-19 pandemic, she could not see John in person. She stated she was not able to call him directly at the correctional facilities, and John could only make calls to persons on an approved call list. According to Bailey, John had not yet been able to get her on the approved call list. Bailey's communication with John was limited to letters. She testified that she wrote monthly letters to John. However, none of those letters were offered or received into evidence. Bailey stated that John responded only twice—once in June 2020 and once in July; she said John did not request visitation with Xaiden in either letter. Again, those letters were not offered or received into evidence. Bailey's testimony was that she had not received any correspondence from John since July and that after July, he failed to remain in contact with her.

At the time of the termination hearing, Xaiden was 20½ months old and had been in foster care for 19½ of those months. It is undisputed that during the time that Xaiden was

- 389 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF XAIDEN N.
Cite as 30 Neb. App. 378

in foster care, John did not provide any money, gifts, or birthday cards for Xaiden. Nor had John had any visits or other contact with Xaiden. Bailey opined that John's parental rights to Xaiden should be terminated because Xaiden had been in foster care for a majority of his life and had not been able to get to know John and had no bond with him. John acknowledged that he had not had contact with Xaiden for the past 1½ years.

John likens this case to *In re Interest of Leland B.*, 19 Neb. App. 17, 797 N.W.2d 282 (2011), wherein this court stated that all of the evidence was anchored on the father's incarceration and that incarceration, standing alone, did not provide grounds for terminating parental rights. However, *In re Interest of Leland B., supra*, is distinguishable because in that case, we determined that the State failed to prove the statutory ground, § 43-292(2), for termination; best interests was not addressed. We have already found that a statutory ground did exist to terminate John's parental rights. And "where, as here, termination is grounded in § 43-292(7), incarceration is not being relied upon as 'the sole factual basis'; instead, the [child's] out-of-home placement is being relied upon." *In re Interest of Mateo L. et al.*, 309 Neb. 565, 580, 961 N.W.2d 516, 527-28 (2021).

Although a statutory ground did exist to terminate John's parental rights in this case, we find that the State has not met its burden to prove by clear and convincing evidence that John is unfit or that it is in Xaiden's best interests for John's parental rights to be terminated at this time. The record is sparse as to what John could have done while incarcerated to work on his court-ordered requirements, particularly under limitations imposed by the COVID-19 pandemic. It is also clear that the pandemic had an impact on John's ability to meet with Xaiden's case manager and to have visitation with Xaiden. Additionally, the termination hearing was held in January 2021, and John was set to be released from his incarceration in June. Given the impact of the pandemic on institutional

- 390 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF XAIDEN N.
Cite as 30 Neb. App. 378

programming and availability, case manager communications, and visitations, along with the short timeframe before John's release, we are perplexed as to why DHHS did not give John some additional time to show he could make progress on his case goals and parent his child before it sought to terminate his parental rights. Given the circumstances of this case, we believe that John should be given such an opportunity, and we therefore reverse the order of the juvenile court terminating his parental rights to Xaiden. See *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016) (termination of parental rights is final and complete severance of child from parent and removes entire bundle of parental rights; therefore, with such severe and final consequences, parental rights should be terminated only in absence of reasonable alternative and as last resort).

## CONCLUSION

For the reasons stated above, we reverse the order of the juvenile court terminating John's parental rights to Xaiden and remand the cause for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.