IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF KRISTOPHER G.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF KRISTOPHER G., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

LADARIUS G., APPELLANT.


Filed March 28, 2023.    No. A-22-630.


Appeal from the County Court for Dawson County: JEFFREY M. WIGHTMAN, Judge. Reversed and remanded for further proceedings.

Claire K. Bazata, of Berreckman & Bazata, P.C., L.L.O., for appellant.

R. Garrett Goodwin, Deputy Dawson County Attorney, for appellee.


PIRTLE, Chief Judge, and MOORE and WELCH, Judges.

MOORE, Judge.

### INTRODUCTION

Ladarius G. appeals from an order of the county court for Dawson County, sitting as a juvenile court, terminating his parental rights to his son, Kristopher G. Upon our de novo review of the record, we conclude that the State failed to prove by clear and convincing evidence that Ladarius was an unfit parent and that it was in Kristopher's best interests to terminate Ladarius' parental rights. We therefore reverse the order of the juvenile court and remand for further proceedings.

- 1 -

STATEMENT OF FACTS

*Procedural Background.*

Ladarius is the biological father of Kristopher, born in June 2020. Kristopher's biological mother, Katelyn G., relinquished her parental rights at the start of the termination trial, and we discuss her only as necessary to the resolution of the current appeal by Ladarius.

Kristopher was removed from Katelyn's care by law enforcement on August 3, 2020, in Lexington, Nebraska. Kentucky authorities had been tracing the cell phone signal of a teenage runaway and alerted local law enforcement that the runaway was in the area. Law enforcement located the runaway in a vehicle along with Katelyn and Kristopher, who was only 6 weeks old. Katelyn, also from Kentucky, reported to law enforcement that she was friends with the runaway and had wanted to get away from home for a couple of days. She was then taken into custody and Kristopher was taken into emergency custody by the Nebraska Department of Health and Human Services (the Department). Katelyn refused to provide the identity of Kristopher's father at the time of his removal. Shortly after Kristopher's removal, he was diagnosed with dehydration and failure to thrive due to his low weight. A petition was filed on August 5 to adjudicate Kristopher pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) based on a lack of proper parental care provided by Katelyn. An ex parte custody order was signed that same day, continuing temporary care with Department. Kristopher has remained out of the home and in foster placement since he was removed.

Katelyn later identified Ladarius as Kristopher's biological father and genetic testing was completed in October 2020. On November 10, 2020, test results were received by the Department indicating that Ladarius was Kristopher's father. Throughout the entirety of this case Ladarius has been incarcerated in Kentucky. Upon discovering that he was Kristopher's father, Ladarius communicated to the Department that he wanted to be a party to the juvenile case. We note that from our record on appeal, it appears that no supplemental petition containing allegations related to Ladarius was ever filed.

The juvenile court entered a dispositional plan regarding Ladarius on December 16, 2020, adopting the case plan presented by the Department. Ladarius' case plan goals included (1) building a relationship with Kristopher by participating in regular video visitation or creating plans to have in person visitation; and (2) having monthly contact with the Department. Several review hearings were held during this case; occurring on March 24, 2021, and June 3, September 7, December 8, and March 9, 2022. The goals of the court adopted plans have been consistent throughout the case. Further details regarding the plans will be discussed in connection with our analysis below.

On April 1, 2022, the State filed a motion for termination of Katelyn and Ladarius' rights to Kristopher; alleging statutory grounds to terminate the parents' rights existed pursuant to Neb. Rev. Stat. § 43-292(6) and (7) (Reissue 2016), and alleging that termination was in Kristopher's best interests.

*Termination Trial.*

A termination trial related only to Ladarius was held on June 8, 2022, as Katelyn relinquished her parental rights at the beginning of the trial. At the trial, two Department caseworkers and Ladarius testified as witnesses.

Amanda Daily was Kristopher's caseworker from September 4, 2020, until April 4, 2022. Daily's involvement with the case ended when Kristopher's permanency goal was changed from reunification to adoption and the case was transferred to a worker on the Department's permanency team.

Daily testified that Ladarius had been incarcerated since September 18, 2020, for second degree battery and wanton endangerment. Ladarius had been incarcerated for the entirety of Kristopher's juvenile case and Kristopher and Ladarius had never met in person or had any physical contact. Daily was concerned that Ladarius was incarcerated for a violent crime, but later acknowledged that she had been mistaken and Ladarius had been convicted of burglary, not battery.

Daily testified to Ladarius' case plan goal of maintaining monthly communication with the Department. Attempting to call the facility where Ladarius was incarcerated, "proved to be very difficult," and Daily was not able to reach Ladarius by placing monthly calls from September to December 2020. Daily thereafter began sending monthly letters to Ladarius which included updates on the case, court proceedings, and Kristopher's developmental progress. At the end of the letter, Daily always instructed Ladarius to call her at a set time and date in 3 to 4 weeks. In addition to including her phone number, Daily included her email address and her office's physical address. Daily's monthly letters were not offered into evidence.

The record shows that Ladarius attempted to call Daily in January 2021 (after receiving the first letter from her), but he was unable to reach Daily due to inclement weather in Nebraska. Ladarius called Daily again on February 4, 2021. During this phone call, Daily was allotted only 15 minutes and she spent the time introducing herself, explaining the posture of Kristopher's juvenile case, and speaking briefly about having Ladarius' family become involved in the case. As Daily began speaking about video visitation between Ladarius and Kristopher the call was cut off. Daily did not receive another phone call from Ladarius until January 27, 2022, which call was initiated by his mother. In this phone call, Ladarius told Daily that he was getting connected with a parenting class, but Daily was unsure if he ever completed the program. Daily did not specifically ask him to participate in any programming.

In one of Daily's phone calls with Ladarius, he indicated that he received all of Daily's letters but that he had no money "on his books" to communicate with Daily. Daily did not believe the Department would be able to provide Ladarius with funds to help facilitate his communication with the Department, but noted that she never discussed putting money in Ladarius' account with a supervisor. Daily also conceded that the Department could have afforded sending Ladarius return addressed stamped envelopes to facilitate written correspondence. Daily did not attempt to make any calls to Ladarius from December 2020 to March 2022.

Daily was unable to fully complete a Family Strengths and Needs Assessment, used for determining case plan goals for families, because she did not have relevant information from Ladarius. Daily acknowledged that her letters did not pose any questions to Ladarius, that she did

not make him aware that she needed to interview him for an evaluation, and that the assessment was never explained to him. Although Daily testified that the assessment was completed using historic information from Katelyn and Ladarius' mother, there is no specific parenting assessment regarding Ladarius in the record. Rather, the case plans and court reports only note that Ladarius is incarcerated out of state. The case plan in March 2021 indicated that after Ladarius completed his sentence, he needed to communicate with the Department in order to fully assess his strengths and needs.

Ladarius' other case plan goal was to build a relationship with Kristopher through participation in regular video visitation, or creating plans to have in person visits with Kristopher. Daily's letters did not provide Ladarius with instructions on how to exercise video visitation with Kristopher. Daily stated that she hoped that Ladarius' mother had provided him with the relevant information regarding video visitation, as Daily had discussed such with her. The record shows that at some point, the Department authorized Ladarius to have video visitation during Katelyn's parenting time.

Ladarius was initially held in a county jail and then was transferred to a correctional facility. The first facility had a specific website application which was necessary to use for any kind of video visitation. Neither Katelyn nor her family support worker were able to get the application downloaded onto their phones. Daily called the first facility in an effort to set up video visitation but her calls went unanswered and she never received a call back from a facility official.

In Ladarius' first facility, the video call application was a paid application which required someone to put money into his account. Daily noted that any member of Ladarius' family could have funded his account in order for video visitation to occur. Daily conceded that the Department has a practice of paying to help parents have visitation with their children, but added that the practice was only applicable to an "engaged parent. . ." When Ladarius was transferred to a second correctional facility in March 2022, he was allotted one visit via Zoom videoconferencing a month.

Daily estimated that six or seven video calls occurred between Ladarius and Kristopher throughout the juvenile case. However, the calls were very short due to Kristopher's young age. Daily was not aware of any occasions where Ladarius refused opportunities to have video visits with Kristopher. Daily did not believe that a significant bond could be developed between a parent and toddler through video calls. No visitation notes or other documentation regarding Ladarius' video visitation with Kristopher was entered into evidence.

All of the videos calls happened with the assistance of Katelyn or Ladarius' mother during Katelyn's supervised visitation with Kristopher. Visitation plans attached to the Department's case plans confirm that Katelyn was tasked by the Department with facilitating video visitation between Ladarius and Kristopher. Daily testified that there was not a possibility for any other video calls to have happened between Ladarius and Kristopher.

Daily was unable to facilitate any in person visits between Ladarius and Kristopher due to Ladarius being incarcerated out of state. Daily did not contact the correctional facilities to inquire into the possibly of an in person visit between Ladarius and Kristopher and did not work with Ladarius' family to set up an in person visit. Daily indicated that the plan for in person visits referenced in Ladarius' case plan was intended for after Ladarius' release. She stated that the Department did not support in person visits if Kristopher had to travel to Kentucky. However, the

March 2021 case plan indicated that the Department would assist with transportation in Nebraska once Ladarius was released.

One of Daily's greatest concerns regarding Ladarius' ability to parent Kristopher was that, at the time of trial, "[t]he Department does not have enough knowledge to safely say that Kristopher would be safe in the care of Ladarius. . ." Daily was also concerned by Ladarius' lack of engagement in the case and with the Department, and opined that termination of Ladarius' parental rights was in Kristopher's best interest.

Daily testified that she completed two "ICPC packets" for home studies on two relatives in Kentucky (Katelyn's aunt and Ladarius' mother), but both ICPCs were denied. Kristopher was placed with two different foster couples; the second couple indicated a willingness to adopt Kristopher.

Paige Peterson was the Department caseworker who took over the case from Daily in April 2022 and was Kristopher's caseworker until the time of trial. Although the court-ordered case plans included a goal that Ladarius build a relationship with Kristopher through weekly supervised video visitation, Peterson had not facilitated any video calls since becoming involved in the case. Because Kristopher's sole permanency goal had been changed to adoption with no secondary goal of reunification, Peterson explained that she was no longer required to provide reasonable efforts to establish a bond between Ladarius and Kristopher.

Peterson testified that she looked up Ladarius' release date on the Kentucky Inmates Website to prepare the most recent case plan. According to Peterson, the website indicated that Ladarius would be released in August 2023, however, a copy of the website page was not offered into evidence. At some point, Ladarius' mother advised that Ladarius was eligible for parole in August 2022.

Peterson had one phone call with Ladarius in May 2022 where he communicated to her that he would be released in August 2022. Ladarius discussed his plans for release with Peterson, which included seeking employment and housing in Kentucky. Ladarius also communicated to Peterson that he had not been able to participate in many courses while incarcerated due to COVID-19 restrictions, but he was able to participate in a reintegration course focused on preparing for his release.

Due to Ladarius' incarceration, Peterson found it challenging to identify his strengths and weaknesses as a parent. However, Peterson noted that no bond existed between Ladarius and Kristopher due to his incarceration. After Ladarius' release it would be a "possibility" that the Department would have to start transporting Kristopher to Kentucky to establish a bond. However, Peterson indicated that Kristopher has an extreme fear of strangers. Peterson stated that introducing Ladarius to Kristopher in person would leave Kristopher "terrified," which would not be in Kristopher's best interests.

Ladarius testified that his date of release was in September 2022 and after his release he would be able to leave the state, subject to approval. He clarified that he was convicted of second degree burglary and first degree wanton endangerment.

Ladarius stated that he wants contact with Kristopher and the ability to work toward reunification. Ladarius was not notified that he was Kristopher's father before his birth, and only discovered that he was Kristopher's father through genetic testing in November 2020.

While incarcerated, Ladarius completed an anger management class and a reintegration class focused on how to gain employment and prepare a budget upon release. Ladarius also started a parenting class but because the instructor resigned, it was never completed.

Ladarius estimated that he had 20 to 30 video calls with Kristopher throughout the case. No information was ever provided by the Department regarding how Ladarius could exercise video visitation with Kristopher and Katelyn was Ladarius' main point of contact for facilitating the video visits. Ladarius also denied that he received any communication regarding the Department's need to complete a Family Strengths and Needs Assessment.

All video calls have been funded by members of Ladarius' family. It cost Ladarius $3.50 to have video visitation with Kristopher and $5 to make a 15-minute phone call. Ladarius testified to foregoing calling the Department in order to save the money for video calls with Kristopher.

*Juvenile Court's Order.*

The juvenile court entered an order on August 3, 2022, terminating Ladarius' parental rights to Kristopher. The court found that pursuant to § 43-292(6), Ladarius had failed to correct the conditions that led to the child being adjudicated under § 43-247(3)(a). The court also found that pursuant to § 43-292(7), Kristopher had been in out-of-home placement for 15 or more months out of the most recent 22 months. The court further found that Ladarius was an unfit parent and that it was in the best interests of Kristopher to have Ladarius' parental rights terminated.

Ladarius appeals.

ASSIGNMENTS OF ERROR

Ladarius assigns, restated, that the juvenile court erred in finding that (1) statutory grounds existed to terminate his parental rights under § 43-292(6), and (2) termination of his parental rights was in Kristopher's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

ANALYSIS

*Statutory Grounds for Termination.*

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 43-292(6) and (7). Ladarius asserts that the State failed to prove the statutory grounds for termination under § 43-292(6). However, Ladarius acknowledges that Kristopher has been out of the home for at least 15 of the most recent 22 months.

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d

424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id*.

Here, Kristopher has been in out-of-home placement for 15 or more months of the most recent 22 months. Kristopher was removed from Katelyn's care on August 3, 2020. The State filed the motion for termination of parental rights on April 1, 2022, and the termination trial was held in June 2022. Kristopher remained out of the home since his removal in August 2020. At the time of trial, Kristopher had been out of the home for 22 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State presented clear and convincing evidence that Kristopher had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Ladarius' parental rights exists.

*Best Interests and Unfitness.*

Ladarius assigns that the juvenile court erred in finding that it was in Kristopher's best interests to terminate his parental rights. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. § 43-292; *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). Because the parent's right to raise his or her children is constitutionally protected, the court may terminate parental rights only when the State shows that the parent is unfit. *In re Interest of Isabel P. et al., supra*. There is a rebuttable presumption that the best interests of the children are served by having a relationship with their parent. *Id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id*.

Our review of the record shows that the Department's case plans and court reports focused almost exclusively on Katelyn. The strategies and services provided for reunification did not mention Ladarius. The only "reasonable effort" in these plans and reports related to Ladarius was to "make monthly efforts to locate and engage Kristopher's alleged father to establish paternity." This notation was included in the reports long after Ladarius was identified as the father.

Almost the entirety of the State's evidence related to best interests and unfitness focused on Ladarius' incarceration. Although incarceration alone cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). And we have noted that although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id*. Thus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id*. We recognize and consider that it was

Ladarius' own actions that caused him to be incarcerated. We also consider the fact that at that the time the crime was committed, he was unaware that Kristopher was his son.

Maintaining monthly contact with the Department was one of Ladarius' case plan goals. Because Ladarius was incarcerated out of state, the Department caseworkers did not see Ladarius in person. According to Daily, her attempts to call Ladarius directly at the correctional facility were unsuccessful (due to the facility not responding) and her communication with Ladarius was limited to monthly letters beginning in December 2020. Daily had only two phone calls with Ladarius, in February 2021 and January 2022. Daily missed a phone call from Ladarius in January 2021 due to inclement weather in Nebraska. Peterson had only one phone call with Ladarius in May 2022. Ladarius agreed that he received letters regarding the status of the case and also received information from his mother who maintained contact with the caseworkers.

Daily testified that Ladarius communicated to her that he did not have the funds to consistently call her. Ladarius explained that rather than spend money on phone calls to the Department, he saved the funds to be used toward video visitation with Kristopher. In addition, Ladarius relied in part upon his mother's communication with the Department.

Ladarius' other case plan goal was to build a relationship with Kristopher through participation in regular video visitation, or creating plans to have in person visits with Kristopher. Although the case plans noted that Ladarius was to be provided monthly video visits with Kristopher, the Department did not do anything to facilitate these visits, leaving them up to Ladarius, his mother, and Katelyn to arrange. Ladarius testified that he received no information from the Department regarding how to access video visitation with Kristopher. The record notes that there was difficulty accessing the video application by these individuals as well as by the family support worker. There is nothing in the record to suggest that the Department made efforts to ensure the video visits with Ladarius occurred. Daily's testimony and the Department case plans reflect that Ladarius' mother was responsible for communicating relevant information regarding video visitation, Ladarius' family was responsible for funding the application to have the visitation, and Katelyn was responsible for facilitating the video calls between Ladarius and Kristopher during her own parenting time. Daily testified that 6-7 video calls occurred during the case and Ladarius testified that the number was closer to 20-30. No documentation evidencing the number of video calls or describing the interactions between Ladarius and Kristopher was entered or received into evidence. Neither Katelyn nor the family support worker who observed these video visits were called to testify.

Although the Department case plans required Ladarius to establish a bond with Kristopher through video visitation, both Department caseworkers testified at trial that they did not believe a significant bond could be developed between a parent and toddler through video calls. Further, Peterson testified that because no bond was established though video visitation, it would not be in Kristopher's best interests for him to meet his father after Ladarius' release. Although Peterson briefly mentioned Kristopher's fear of strangers, no evidence from a child psychologist or other clinician was offered to support this assertion or describe what services could be offered to assist Kristopher in meeting his father.

The Department did not require Ladarius to participate in any programs while he was incarcerated. Ladarius testified that he completed an anger management and a reintegration course, and was at one point enrolled in a parenting class. The Department did not seek any evaluations

of Ladarius or attempt to gather information regarding his history or parenting abilities. Although we recognize that such background work may be difficult given that Ladarius was in Kentucky, there was essentially no effort to consider reunification with Ladarius for the stated reason that he was incarcerated out of state.

Finally, there appears to have been confusion at trial regarding Ladarius' date of release as the caseworkers and Ladarius testified to different dates. Ladarius stated that he would be released in September 2022, a few months after the termination trial. Although Peterson testified that she had looked up the date of release on the Kentucky Inmates Website, which showed August 2023, the Department did not offer any further evidence or documentation from the Kentucky Department of Corrections to address the differing dates. We note that the record shows the Department was advised by Ladarius' mother that he was eligible for parole in August 2022.

Kristopher has spent all but the first 6 weeks of his life in foster care, having been removed from his mother's custody due to neglect. Ladarius did not know he was Kristopher's father until genetic testing was completed a couple of months later, at which time he was already incarcerated. It is uncontested that Ladarius and Kristopher have never had any physical contact due to Kristopher's presence in Nebraska and Ladarius' incarceration in Kentucky.

In *In re Interest of Denzel D.*, 31 Neb. App. 547, 985 N.W.2d 45 (2023), this court recently considered whether it was in the child's best interests to terminate the parental rights of a father who did not learn that he was the biological father of the child until after he was already incarcerated. While the father remained incarcerated through the pendency of the juvenile case and the termination trial, we noted that he had demonstrated a commitment to the child through consistent phone calls, completing various classes and programming, and participation in the services required of him. Because the father actively worked to improve his parenting skills and to maintain a relationship with his child, we determined that termination of the father's rights was not in the child's best interests.

Similarly, in *In re Interest of Xaiden N.*, 30 Neb. App. 378, 968 N.W.2d 856 (2021), we reversed the termination of a father's parental rights. Although the State had proven the statutory ground for termination under § 43-292(7), we concluded that the State failed to prove that the father was unfit or that it was in the child's best interests to terminate the father's parental rights. In that case, the child was removed from his parents care when he was approximately 1 month old. Shortly thereafter, the father was arrested, and was incarcerated throughout the case. The father was not able to have in person visits and he was unable to arrange virtual visits. We found that the record was sparse as to what the father could have done while incarcerated to work toward reunification with his child. We noted that the father's ability to meet with the caseworker and to have visitation was limited by the COVID-19 pandemic. We also noted the evidence that the father was to be released from incarceration approximately 5 months after the termination trial. Under these circumstances, we concluded that the father should have been given additional time to show he could make progress on his case goals and parent the child before the Department sought to terminate his parental rights.

We find the case before us to be similar to *In re Interest of Denzel D.* and *In re Interest of Xaiden N.* Ladarius did not learn that he was Kristopher's biological father until after he was already incarcerated, and upon learning of his paternity, Ladarius sought to be part of the juvenile case. He has participated in video visits with Kristopher whenever possible, he has availed himself

of certain programs, and he has made some efforts to stay abreast of the juvenile court proceedings, including direct communication with the Department, receiving information from his mother, and in reviewing the written information sent to him. Ladarius has clearly made it known to the Department that he desires to establish a relationship with Kristopher and to pursue reunification. In fact, the June 2022 case plan references that Ladarius stated on numerous occasions that he felt he had not been given a fair opportunity to work toward reunification with Kristopher.

We conclude that the State has not met its burden to prove by clear and convincing evidence that Ladarius is unfit or that it is in Kristopher's best interests for Ladarius' parental rights to be terminated at this time. Daily testified that one of her greatest concerns was that the Department did not have enough knowledge to evaluate Ladarius' capacity as a parent. However, our review of the record does not show that the Department made any effort to obtain such information. Without evidence of Ladarius' capacity as a parent, it is impossible to determine his fitness. Given Ladarius' impending release from incarceration (whether September 2022 or August 2023), the Department could have obtained more complete information regarding Ladarius' parental fitness and capacity, and if an assessment revealed Ladarius to be an appropriate parent for Kristopher, a plan to attempt reunification could have been developed. Ladarius expressed a willingness to come to Nebraska upon his release from incarceration for the purpose of pursuing reunification. We recognize that Kristopher does not know his father and he is placed with foster parents willing to adopt him. However, the termination of Ladarius' parental rights, without clear and convincing evidence that he is an unfit parent, was error. Based upon these circumstances, we conclude that Ladarius should be given an opportunity to make progress on a reunification plan.

Under the circumstances of this case, we reverse the order of the juvenile court terminating Ladarius' parental rights to Kristopher. See *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016) (termination of parental rights is final and complete severance of child from parent and removes entire bundle of parental rights; therefore, with such severe and final consequences, parental rights should be terminated only in absence of reasonable alternative and as last resort).

CONCLUSION

For the reasons stated above, we reverse the order of the juvenile court terminating Ladarius' parental rights to Kristopher and remand the cause for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.